UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LABELS, INC., FLEX-PRINT, INC. and LABELS REALTY TRUST ) ) ) ) Plaintiffs, ) ) v. ) ) ROBERT DION, BANKNORTH GROUP, INC., ) as Successor in Interest to ) FIRST & OCEAN NATIONAL BANK; ) HEALEY, DESHAIES, GAGLIARDI & ) WOEFEL, P.C.; and PHILLIPS, GUERSTEIN, ) HOLBER & CHANNEN LLP ) ) Defendants. ) | Case No.<br><br>04 - 11770 JLT<br><br>MAGISTRATE JUDGE _Alexander_<br><br>RECEIPT # _____<br>AMOUNT $ _150_<br>SUMMONS ISSUED____✓____<br>LOCAL RULE 4.1_____<br>WAIVER FORM _____<br>MCF ISSUED_____<br>BY DPTY. CLK._____<br>DATE_____8-13-04 |

**COMPLAINT**

This is an action for breach of contract, breach of fiduciary duty, violation of M.G.L. ch. 93A and violation of RICO brought by several related companies against their former shareholder /co-owner, Robert Dion ("Dion"), his attorneys and a banking institution. Through a series of transactions, these defendants acted together to place a stranglehold on plaintiffs and their current owner, Robert Zakian ("Zakian"), to leverage an unconscionable buyout of Dion's interests in the companies. Through this action, plaintiffs seek to rescind the buyout agreement with Dion and recover damages from defendants for their misconduct.

JURISDICTION AND VENUE

1.    Jurisdiction is proper pursuant to 28 U.S.C. §1331.

2.    Venue is proper pursuant to 28 U.S.C. §1391.

3.    The Court has supplementary jurisdiction over the claims asserted under the laws

of the Commonwealth of Massachusetts pursuant to 28 U.S.C. §1367.

     4.     The Court has personal jurisdiction over defendants pursuant to M.G.L. ch. 223A §3.

PARTIES

     5.     Plaintiff Labels, Inc. ("Labels") is a closely held Massachusetts corporation with a principal place of business at 10 Merrill Industrial Drive, Hampton, New Hampshire.

     6.     Plaintiff Flex-Print, Inc. ("Flex-Print") is a closely held New Hampshire corporation with a principal place of business at 10 Merrill Industrial Drive, Hampton, New Hampshire.

     7.     Plaintiff Labels Realty Trust (the "Trust") is a Massachusetts realty trust.

     8.     Collectively, Labels, Flex-Print and the Trust are referred to as the "Labels Companies."

     9.     Defendant Robert Dion is an individual residing at 5564 Fox Hunt Way, Naples, Florida  34104.

     10.     Defendant Banknorth Group, Inc. ("Banknorth") is a Maine corporation with its principal place of business in Portland, Maine.  Banknorth became the successor in interest to First & Ocean National Bank in or about September 2003 ("First & Ocean").

     11.     Defendant Healey, Deshaies, Gagliardi & Woefel, P.C., is a law partnership with a place of business at 38 Market Street, Amesbury, Massachusetts 01913.

     12.     Defendant Phillips, Guerstein, Holber & Channen, LLP is a law partnership with a place of business at 25 Kenoza Avenue, Haverill, Massachusetts 01830.

## FACTS

Background on the Labels Companies

13.     Labels and Flex-Print manufacture pressure sensitive labels, decals and flexible packaging. Since 1976, the companies have been owned by Zakian and Dion, each as 50% shareholders.

14.     Prior to 2000, Labels and Flex-Print operated at three locations. The principal place of business for Labels was 91 High Street, Amesbury, Massachusetts (the "Amesbury Property"). The Amesbury Property was owned by Labels Realty Trust, which in turn was owned by Zakian and Dion. The Labels Companies also leased two other properties, on which both Zakian and Dion had personal guarantees.

15.     On June 18, 1998, The Labels Companies procured a loan from First & Ocean in the amount of $1,120,000 to refinance existing loan obligations. At that time, the parties also signed a new line of credit for Labels in the amount of $100,000. At a later date, Flex-Print obtained a line of credit in the amount of $50,000, also from First & Ocean. Zakian and Dion signed personal guarantees on these loan obligations. In short, First & Ocean was the Labels Companies primary banking relationship.

16.     On April 7, 1999, a Labels and Flex-Print's board of directors meeting was held and it was resolved that the Labels Companies had a total combined value of $3,000,000. That value was pegged solely on the fact that Labels was the beneficiary of $1,500,000 life insurance policies on both Zakian and Dion.

The Consolidation of Labels and Flex-Print's Operations.

17.     Between April 1999 and August 2000, Dion and Zakian searched for a commercial rental property to relocate and consolidate Labels and Flex-Print. Dion, however,

refused to personally guarantee any additional loans or other business obligations citing his desire to retire.

18.    To accommodate Dion, Zakian decided to use his own money to purchase a commercial property and lease it back to Labels and Flex-Print. Dion agreed.

19.    Zakian found property for sale in Hampton, New Hampshire, close to Flex-Print's operation (the "Hampton Property"). This was to be the new principal place of business for both Labels and Flex-Print.

20.    Zakian arranged for the sale of their old headquarters, the Amesbury Property, to another company, Alkim, LLC ("Alkim"), for $500,000. But the sale was contingent upon Alkim's obtaining financing.

First & Ocean Agrees to Finance Both the Sale of the Amesbury Property and the Purchase of the Hampton Property.

21.    In late August 2000, Zakian met with Marc MacBurnie ("MacBurnie"), Vice-President of First & Ocean, seeking financing for both his purchase of the Hampton Property and Alkim's purchase of the Amesbury Property.

22.    MacBurnie saw no problems with the loans. But he informed Zakian that because Zakian was seeking a personal loan for his purchase of the Hampton Property, his application would be enhanced if he could get the Small Business Administration ("SBA") to guaranty the loan. MacBurnie offered to call the SBA in Portsmouth, New Hampshire—whose liaison was Granite State Development—and arrange a meeting with their representative, Steve Aldrich.

Obtaining Financing for the Purchase of the Hampton Property.

23.    On or about September 6, 2000, a meeting was held at Labels with MacBurnie of First & Ocean, Steve Aldrich of Granite State Development, Dion, Zakian and Edward Paquette ("Paquette"), controller of Labels. At the meeting, Zakian and Dion learned that to obtain the

SBA guaranty they would have to both personally guaranty the loan.

24.     This was because the Labels Companies were to be both the lessees of the property and guarantors of Zakian's loan. Under these circumstances, the SBA rules required an additional personal guaranty from anyone holding a 20% ownership in the Labels Companies.

25.     During the meeting, Dion stated he would not sign personally for any further loans.

26.     On September 12, 2000, Zakian signed a Purchase and Sale Agreement to acquire the Hampton Property for $1,500,000. The Purchase and Sale Agreement required an initial deposit of $10,000 and an additional deposit of $125,000 upon expiration of the due diligence period, October 1, 2000. The balance of $1,415,000 was due at the closing on January 3, 2001.

27.     On September 13, 2000, Dion, Zakian, Paquette and MacBurnie met at the office of attorney Paul Gagliardi ("Gagliardi"), to refinance the first mortgage on the Amesbury Property with First & Ocean. Gagliardi represented First & Ocean in the closing.

28.     After the closing, Zakian gave MacBurnie a copy of the Purchase and Sale Agreement for the Hampton Property. MacBurnie stated the Bank would work with the SBA to finance Zakian's personal acquisition of the Hampton Property.

29.     On September 29, 2000, Dion, Zakian, Paquette and MacBurnie met with Gagliardi, who now was also representing Alkim in its acquisition of the Amesbury Property with financing through First & Ocean. At the meeting, the parties signed a Purchase and Sale Agreement for the Amesbury Property. Zakian and Dion again told MacBurnie that Dion was contemplating an early retirement and that Zakian would acquire the Hampton Property by himself. Zakian then arranged a meeting with MacBurnie later that day.

30.     At or around 2:00 p.m., Zakian, Paquette, and John Cardellicchio met with MacBurnie at his office at First & Ocean. Zakian informed MacBurnie that he intended to close on the purchase of the Hampton Property after the closing of the sale of the Amesbury Property so he could use part of the sale proceeds as a down payment. Zakian asked MacBurnie what kind of short term personal loan the Bank could make him to cover the $125,000 additional deposit due upon expiration of the due diligence period on the Hampton Property, October 3, 2000. MacBurnie stated that Zakian could draw the amount from the Labels and Flex-Print lines of credit. Zakian agreed to this proposal as the companies owed Zakian in excess of $125,000 for outstanding loans.

31.     On that date, Paquette sent a confirmation letter to MacBurnie seeking authorization to use the Labels and Flex-Print lines for the $125,000 deposit. MacBurnie authorized the transactions. Indeed on information and belief, both lines of credit were reactivated by MacBurnie.

The Proposed Buyout of Dion

32.     As set forth in detail above, Dion refused to participate with Zakian in any further financial undertakings for the benefit of the Labels Companies. Dion also was not participating in the day-to-day operation of the company, but continued to draw a large salary.

33.     Despite Dion's refusal to actively participate in the company, Zakian sought approval from the SBA to reduce Dion's ownership in the companies below 20%, so that Dion could retain some ownership interest, but not be required to sign any personal guarantee or asset pledge. The SBA informed Zakian, however, that such a maneuver would not succeed, and that the SBA would require Dion's participation based on Dion's then current 50% ownership share of Labels and Flex-Print, the lessees of the property and guarantors of the loan.

34.     Backed against a wall (due to Dion's refusal to personally sign for any further loans, and the SBA's refusal to guarantee a loan while Dion was still a shareholder of the Labels Companies), Zakian was forced to attempt a buy-out of Dion's interest in the companies.

35.     On October 5, 2000, Zakian spoke with Dion by telephone regarding his retirement as well as the potential of the Labels Companies buying out his interest in the companies. Zakian followed up with a letter dated October 5, 2000. In that letter, he wrote "[i]n order for the companies to survive I must personally take on the full financial liabilities of the companies, and for me to do that, I must control 100% of the stock."

36.     At this time the Labels Companies were worth no more than $800,000 and Zakian was being forced to invest his own capital to keep them afloat. But Dion insisted that for purposes of his buyout, the value of the companies was tied to the $1.5 million key man life insurance policies carried on Dion and Zakian.

37.     On October 24, 2000, Zakian traveled to Naples, Florida to meet Dion and discuss a buyout agreement. The next day, Dion and Zakian signed a corporate resolution authorizing Labels to buy Dion's stock for the amount of $1,500,000, with $100,000 payable immediately, and $1,400,000 in the form of a five-year balloon note (the "Resolution"). Dion also would be released from his personal liability on the Labels Companies' debts. Additionally, Dion was to assist the companies in their litigation against Fleet Bank for improper foreclosure.

38.     Dion resigned from his positions with the Labels Companies and accepted a $100,000 check. He also began accepting weekly payments under the terms of the Resolution, although no promissory note had yet been drafted, let alone executed.

39.     The Resolution could not be finalized until after the sale of the Amesbury Property, at which time Dion would no longer be personally liable for any of the Labels

Companies' loans.  Also, the closing documents needed to be formally drafted and executed.  In short, the Resolution constituted, at best, an agreement to agree.

40.    On October 26, 2000, Zakian met MacBurnie at the Bank and gave him a copy of the Resolution and Dion's resignations.  MacBurnie prepared the SBA documents and had Zakian sign as President, Treasurer, Secretary and sole proprietor, endorsing the SBA loan of $638,000.  MacBurnie took these actions with knowledge that Zakian was *not* the sole owner of the Labels Companies.

Dion Seeks to Renegotiate His Buyout and Solicits the Help of Gagliardi.

41.    The original stock certificates for the Labels Companies could not be located.  On November 30, 2000, Zakian requested that Paquette prepare two substitute certificates to advance Labels' buyout of Dion.  Dion, however, refused to sign the certificates.

42.    As a result, on November 30, 2000, Zakian sent a letter to Dion rescinding his approval of the Resolution.  Zakian stated he intended to go forward with his personal acquisition of the Hampton Property and asked *"Please advise me on what duties and corporate responsibilities that you would want to undertake.  Bob, please, an immediate response is necessary."*

43.    At some point in late November or early December, Dion retained Gagliardi to help him renegotiate the terms of his buyout as set forth in the Resolution.

44.    Gagliardi had previously served as the Bank's counsel in connection with Label's June 1998 refinance, and the September 2000 first mortgage on the Amesbury Property.  Gagliardi also was serving as counsel to Alkim, the buyer of the Amesbury Property.

45.    On December 4, 2000, Gagliardi sent a letter to Zakian, *on behalf of Dion*, seeking to change the terms in the Resolution.  Gagliardi wrote "the terms as outlined in the

corporate votes would inadequately protect [Dion's] interest." Gagliardi stated that Dion would return the $100,000 paid to him when he is "reinstated" in the company, including "weekly paychecks to Bob and his wife Laurie." Finally, Gagliardi proposed drafting the appropriate documents to effectuate Dion's buyout. In short, Dion unequivocally rejected the resolution.

46.     On December 6, 2000, Zakian met with Gagliardi at his office regarding the proposal contained in his letter of December 4, 2000. Gagliardi explained again that Dion still wanted to sell his interest in the companies but that Resolution did not adequately protect Dion's interest and offered to prepare new documents. Gagliardi asked how much Zakian would pay to buy Dion out. Zakian needed time to consider the proposal, and promised to call Gagliardi later.

47.     Later that day, Zakian called Gagliardi and stated he would be willing to loan Labels $1,000,000 to buy out Dion; $700,000 up front and $300,000 after an audit of Labels and Flex-Print by their accountant. But Dion refused Zakian's offer and stated that he would only accept $1,400,000 in cash. Upon information and belief, Dion was demanding cash up front because he knew that the company was not worth the $3 million value that had been used to establish his buyout price. Specifically, once Dion stopped being an owner, the companies would ultimately lose his key man insurance and the $1.5 million benefit to be paid upon his death, because Dion was in such poor health that he was virtually uninsurable.

48.     The next day, Zakian received a call from Phillips, (a new attorney who Gagliardi had lined up to represent Dion), requesting a meeting. The parties met at Flex-Print's office in New Hampshire. At that meeting, Phillips and Channen claimed that the Resolution was not a binding contract. They then asked Zakian to either buy out Dion with cash or to enter into a new agreement with Dion, whereby Zakian would have to pay more cash up front, personally guarantee the payments, and pledge the Hampton property as collateral. Zakian refused.

First and Ocean Threatens To Pull The Financing for the Hampton Property Acquisition.

49.    By letter dated December 13, 2000, Grace Connolly ("Connolly") a new attorney

for First & Ocean, sent Labels a default notice. The alleged defaults were:  potential litigation

between the principals; hundred of thousands of dollars on legal fees on a newly filed lawsuit;

resignation of Dion without the Bank's prior written consent; and Dion's purported assignment

of his interest in Labels Realty Trust without the Bank's prior written consent.  Connelly stated:

"the bank cannot proceed further with your recent request for financing associated with the

companies proposed acquisition of 10 Merrill Industrial Drive in Hampton, New Hampshire,

until these issues are resolved to the Bank's satisfaction."

50.    One day later, on December 14, 2000, MacBurnie (the Bank's Vice President)

sent a letter stating the bank would not finance the acquisition of the Hampton Property.

Remarkably, MacBurnie stated that he "would be willing to reconsider [Zakian's] request subject

an approved participation with Granite State Development Corporation pursuant to the terms of

the U.S. Small Business Administration 504 Loan Program."  MacBurnie further stated that he

has forwarded "under separate cover the appropriate applications and materials."

51.    MacBurnie failed to disclose, however, that he had already sent the SBA the loan

guarantee application that he completed at the October 26, 2000 meeting with Zakian.  Indeed,

on July 12, 2002, Zakian requested from Granite State Development a copy of his file and

learned for the first time that First & Ocean had received the SBA's approval of the $638,000

loan guarantee on December 27, 2000.

52.    Upon information and belief, MacBurnie sought to cover up the fact that he had

already submitted the application to the SBA to protect himself and First & Ocean from any civil

10

or criminal liability for providing the SBA with false information about the Labels Companies—
the false information was that Dion did not have a 20 percent interest in the companies and that
Zakian was not the President, Treasurer, Secretary and sole proprietor.

53.     On information and belief, although there were no payment defaults on plaintiffs'
loan obligations, First & Ocean acted in connection with and/or at the behest of the other
defendants to squeeze plaintiffs financially, and force them to capitulate to Dion's demands.

54.     Indeed, plaintiffs have discovered a pattern of questionable banking practices at
First & Ocean with respect to the processing of the Labels Companies' small business loan that
have directly affected the plaintiffs.

55.     On information and belief, First & Ocean also sought to aid Dion because they
did not want him to retain an independent outside counsel who would then advise Dion of the
bank's malfeasance and potential liability to him. Dion's current counsel, Gagliardi did a
substantial amount of work for First & Ocean and was loyal to the bank. Phillips was a close
friend of Gagliardi, and was hand picked to serve as Dion's new attorney. Thus, by siding with
Dion, First & Ocean was able to keep their preferred counsel (Gagliardi) and his friend (Phillips)
in place as Dion's attorneys.

Zakian is Forced To Seek Financing Elsewhere.

56.     When First & Ocean reneged on its loan commitment to Zakian to purchase the
Hampton Property, the plaintiffs were placed in an untenable position. As defendants were well
aware, plaintiffs were contractually committed to sell Labels' current offices to Alkim (First &
Ocean was financing Alkim's purchase). Zakian was therefore forced to finance the purchase
through alternate means, on far less favorable terms.

57.     On December 19, 2000, Kennebunk Savings Bank ("Kennebunk") approved a
$900,000 mortgage loan for the purchase of the Hampton Property. Zakian, therefore, was
forced to contribute over $600,000 of his own funds to close the transaction. Thereafter, on
January 3, 2001, Kennebunk approved Labels' request for a loan of $730,000 to refinance
existing First & Ocean Bank term debt and line of credit with Zakian as guarantor.

Dion Sues Zakian to Tie Up His Assets And Gain Leverage in Negotiations.

58.     On December 22, 2000, Dion's attorneys sent a 93A demand letter accusing
Zakian of fraud, deceit, misrepresentation, breach of contract and RICO violations. Reversing
arguments presented just weeks earlier, Dion's lawyers threatened to sue Labels and Zakian
personally, to enforce the terms of the Resolution—which Dion previously claimed
"inadequately protect(ed) his interest," and would not hold up in Court.

59.     On January 3, 2001, Dion filed a Verified Complaint in Superior Court of
Massachusetts, against the Labels Companies and Zakian personally, to enforce the Resolution
as a binding contract. The allegations contained in that Complaint were grossly inaccurate and
the Complaint was filed solely for improper purposes—to force the company to bow to Dion's
extortionate demands in the buyout.

The Defendants' Scheme to Strangle Plaintiffs' Into Submission By Tying Up Their Funds In an
Escrow "Bait and Switch."

60.     Zakian's attorney received a letter dated January 4, 2001 from Connolly stating
that First & Ocean had received a request from Kennebunk for loan payoffs and needed Zakian's
written authorization to release this information to Kennebunk. Zakian immediately provided
Connolly with the requested authorization. In short, as of January 4, First & Ocean knew certain
of its loans were to be paid off by Kennebunk.

61.    On Monday, January 8, 2001, Zakian signed a commercial note with Kennebunk with less favorable terms to pay-off the Labels Companies' loans with First & Ocean (except for a $146,000 mortgage of the Trust ("First Mortgage"). That same day, Labels' controller Paquette hand delivered to MacBurnie a bank check for $809,947.69, dated January 8, 2001, to payoff the loans (except the First Mortgage) prior to the closing of the Amesbury Property.

62.    The Kennebunk pay-off check cleared on January 10, 2001. Indeed the loan history records of the Labels and Flex-Print indicate that all outstanding loans were paid in full by January 10, 2001.

63.    Later that day (January 8, 2001), Zakian attended the closing of the sale of the Amesbury Property by Labels Realty Trust to Alkim. Richard McCarthy (Zakian's attorney), Russell Channen (Dion's attorney), Mr. & Mrs. Porter of Alkim, and Paul Gagliardi attended. Gagliardi represented both Alkim (the buyers) and First & Ocean at the closing. Before signing the Settlement Statement, Zakian informed everyone present that he had remitted a check to First & Ocean to payoff all mortgages except the First Mortgage.

64.    The settlement statement provided that First & Ocean would receive the net proceeds of $496,075. Gagliardi, however, directed his clients (Alkim and First & Ocean) and Zakian to sign the Settlement Statement as written, stating that the net proceeds of $496,075.41 would be directly deposited into the Trust's account at First & Ocean, and that $146,000 would be deducted out to pay-off the First Mortgage. This would conclude all loan obligations of the Labels Companies with First & Ocean and would leave Zakian with approximately $350,000 in the Labels Realty Trust for the Labels Companies' acquisition of and relocation to the Hampton Property.

65.    Based upon Gagliardi's representations, and the agreement of all parties, Zakian

signed the settlement statement.

66.     First & Ocean, Dion and Gagliardi all knew that Labels had just sold the Amesbury Property and needed the $350,000 for the Hampton Property, including funds to retrofit the new facility and relocate its headquarters. Moreover, they knew that the closing on the Hampton Property was scheduled for January 11, 2001—just three days later.

Defendants Breach The Agreement At the Closing and Lower the Boom on Zakian.

67.     Despite Gagliardi's obligation under the Settlement Statement to immediately tender the sale proceeds to the Trust, the agreement of all parties that he do so, and his knowledge that the Labels Companies needed the funds to relocate their headquarters, Gagliardi held the money.

68.     Two days later, Channen sent letters to Zakian and Gagliardi stating that he "*instructed attorney Paul J. Gagliardi, closing attorney for First & Ocean Bank, to hold such funds in a separate interest bearing account pending an agreement by the parties or an Order of the court.*" This instruction was in clear violation of the parties' agreement at the closing that the sale proceeds would be immediately deposited in the Trust's account at First & Ocean. The next day, Channen suggested that Gagliardi be the "disinterested stakeholder" of the money.

69.     In short, Channen (Dion's current counsel) instructed Gagliardi (Dion's former counsel) to not to release the sale proceed to Zakian. On information and belief, defendants' plan was to tie up the money so that the Labels Companies lacked the funds to effectuate the relocation to the Hampton Property. This would give defendants unbridled leverage to force Zakian to capitulate to Dion's buyout demands.

70.     On January 11, 2001, Zakian Realty Trust was contractually obligated to purchase the Hampton Property. Having no available cash, Zakian was forced to personally contribute an

additional $500,000 in cash at the closing.

71.     By letters dated January 11 and January 12, 2001, Zakian's attorney demanded that Gagliardi pay the Trust the proceeds from the sale of the Amesbury Property.

72.     Gagliardi never answered these letters.

73.     Instead, in accordance with defendants' plan, on January 16, 2001, Dion filed an Ex Parte Motion "To Order Transfer of Sale Proceeds to Robert Dion or, in the Alternative, Order the Sale Proceeds Held in Escrow (the "TRO Motion").

74.     The Court denied the Ex Parte Motion, but placed an attachment on the funds, "held by Paul J. Gagliardi, Esq." Thus, defendants got their stranglehold on Zakian.

75.     Gagliardi later claimed to have put the money in his own IOLTA account following the closing. On January 18, 2001, Gagliardi sent a letter to Zakian's attorney stating that he left on January 11th "for a five day getaway. As a result, I was unable to do anything with the funds until my return on Wednesday, January 17, 2001."

76.     In other words, despite his fiduciary obligation as settlement agent to disburse the funds, the agreement of the parties, and his knowledge that Zakian needed the money for the acquisition of and relocation to the Hampton Property, Gagliardi claimed he simply let the funds sit in his own account for 9 days, while he went on a "get away."

77.     On information and belief, Gagliardi (Dion's former counsel), Phillips (Dion's then current counsel), Dion and First & Ocean conspired to breach the Settlement Statement, the escrow agreement, and interfere with plaintiffs' relocation to the Hampton Property by withholding the proceeds of the Amesbury Property sale.

78.     The TRO papers contained demonstrably false allegations, including that Zakian had "concealed and intentionally withheld" the fact that Labels had paid off the First & Ocean

obligations. The defendants were also seeking to enforce the terms of the Resolution, which they unequivocally rejected as an enforceable contract on multiple occasions.

79.     On February 6, 2002, Gagliardi sent a letter to Zakian accompanied by a 1099-INT from First & Ocean, regarding monies held in escrow from the sale of the Hampton Property. This 1099-INT indicated the proceeds from the sale were deposited in an account at First & Ocean, under Labels Realty Trust, Paul J. Gagliardi, Escrow Agent. Labels Realty Trust never authorized Gagliardi to serve as its escrow agent. On information and belief, the proceeds were never held in Gagliardi's IOLTA account, because such funds do not bear interest. The proceeds ($496,075.41) had to be disbursed to the bank according to the Settlement Statement.

The Cataclysmic Effect on Labels Caused by the Wrongful Attachment

80.     As the defendants knew, plaintiffs desperately needed the escrow funds in order to relocate their businesses to the Hampton Property. Indeed, Labels was forced to lease back the Amesbury Property from Alkim in order to continue its operation.

81.     Kennebunk would not increase the line of credit, nor issue any new loans to plaintiffs because the pendency of the lawsuit. Likewise, plaintiffs could not seek financing elsewhere because the lawsuit was pending.

82.     To release the attachment and with no alternatives, plaintiffs were involuntarily forced to enter into a one-sided buyout agreement with Dion.

83.     Specifically, in October 2001, plaintiffs signed a promissory note that purportedly bound the companies to the terms of the Resolution, and required them to maintain, at their own cost, a $1.4 million Keyman Insurance policy on Dion. Although there was no such requirement in the Resolution, plaintiffs were also forced to sign a Stock Pledge Agreement that purported to secure the obligations of the Note with Dion's shares

84.    Due to Dion's poor health, he has become uninsurable.  On information and
belief, Dion failed his last medical exam, and no insurance company will provide a $1.4 million
Keyman life insurance policy for him.  In short, the entire underpinning of the Labels Companies
valuation has now collapsed.

## COUNT I
### (Breach of Escrow Agreements)

85.    Plaintiffs repeat, reallege, and incorporates their responses contained in
paragraphs 1 through 84 above.

86.    Defendants breached the terms of the Escrow Agreement and the Settlement
Statement by, among other actions, failing to immediately disburse to Labels Realty Trust 100%
of the net proceeds from the sale of the Amesbury Property.

87.    As a direct and proximate result, plaintiffs suffered damages.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

88.    Plaintiffs repeat, reallege, and incorporate their responses contained in paragraphs
1 through 87 above.

89.    Defendant's conduct constitutes a breach of the implied covenant of good faith
and fair dealing.

90.    As a direct and proximate result, plaintiffs have suffered damages.

## COUNT III
### (Violations of M.G.L. c.93A)

91.    Plaintiffs repeat, reallege, and incorporate their responses contained in paragraphs
1 through 90 above.

92.    At all relevant times plaintiffs and defendants were engaged in trade or commerce within the meaning of M.G.L. ch. 93A.

93.    By their unfair and deceptive actions described above, defendants violated M.G.L. c. 93A §§ 2, 11.

94.    Defendants' unfair and deceptive actions occurred primarily and substantially in Massachusetts.

95.    Defendants' actions were performed willfully and knowingly.

96.    As a direct and proximate result of defendants' unfair and deceptive practices, plaintiffs have suffered damages.

## COUNT IV
### (Declaratory Judgment)

97.    Plaintiffs repeat, reallege, and incorporate their responses contained in paragraphs 1 through 96 above.

98.    There is an actual controversy among the parties as to the terms and enforceability of the Resolution, the Note and the Pledge Agreement.

99.    Plaintiffs contend these purported obligations are void due to duress, unconscionability, and impossibility of performance, among other reasons.

100.    Plaintiffs seek a declaration that the Resolution, the Note and the Pledge Agreement are null and void.

## COUNT V
### (Breach of Fiduciary Duty)

101.    Plaintiffs repeat, reallege, and incorporate their responses contained in paragraphs 1 through 100 above.

102.    As a director, officer, shareholder and trustee, Dion owed fiduciary duties to plaintiffs.

103.    As settlement agent and escrow holder, Gagliardi owed a fiduciary duty to plaintiffs.

104.    Through their conduct, Dion and Gagliardi breached their fiduciary duties to plaintiffs.

105.    As a direct and proximate result, plaintiffs suffered damages.

106.    Dion and Gagliardi concealed their illegal and fraudulent conduct from plaintiffs.

### COUNT VI
### (Violation of 18 U.S.C. §1962(c)—RICO)

107.    Plaintiffs repeat, reallege, and incorporate their responses contained in paragraphs 1 through 106 above.

108.    Defendants are "persons" as defined by 18 U.S.C. §1961(3).

109.    The Labels Companies are "enterprises" as defined by 18 U.S.C. §1961(4).

110.    The Labels Companies sell pressure sensitive labels, decals and flexible packaging in many states and their activities affect interstate commerce.

111.    Defendants are separate and distinct from the Labels Companies.

112.    Defendants have utilized a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5), to infiltrate the Labels Companies and force them to buyout Dion's shares at an unconscionable price.

113.    Specifically, defendants worked together in furtherance of their common scheme to place an economic stranglehold on the Labels Companies by illegally tying up the proceeds from the sale of the Amesbury Property and threatening to pull financing for the purchase of the

Hampton Property. Once their hold was secure, defendants extorted a buyback of Dion's shares at an unconscionable price.

114.    In executing their illegal scheme, each defendant agreed to the commission of two or more of the following acts: extortion as proscribed by 18 U.S.C. §1951; extortion as proscribed by M.G.L. ch. 265 §25; banking fraud as proscribed by 18 U.S.C. §1344; mail fraud as proscribed by 18 U.S.C. §1341; and wire fraud as proscribed by 18 U.S.C. §1343.

115.    In furtherance of the scheme described above, defendants agreed to commit and did commit extortion in violation of 18 U.S.C. §1951. Specifically, they obstructed, delayed and/or affected interstate commerce (*e.g.*, Labels' business, the relocation of its headquarters and the construction of its new facilities) by conspiring to threaten and threatening severe economic harm to Labels Companies' business to compel them to buy back Dion's shares at an unconscionable price.

116.    In furtherance of the scheme described above, defendants agreed to commit and did commit extortion in violation of M.G.L. ch. 265 §25. Specifically, conspiring to threaten and did threaten severe economic harm to Labels Companies' business to extort a pecuniary advantage with the intent of compelling them to buy back Dion's shares at an unconscionable price against their will.

117.    In furtherance of the scheme described above, defendants agreed to commit and did commit banking fraud in violation of 18 U.S.C. §1344. Specifically, at the closing on the Amesbury Property defendants agreed that the proceeds (less the First Mortgage) would be released to the Labels Companies so that they could proceed with the purchase and relocation of their headquarters to the Hampton Property. Defendants never intended to honor their agreement, but instead intended to obtain these proceeds and use them as leverage against the

Labels Companies to force a buyout of Dion's shares. In doing so, defendants obtained.

moneys, funds, credits, assets, securities, or other property under the custody or control of a

financial institution (First & Ocean) by means of false or fraudulent pretenses, representations or

promises.

118.    In furtherance of the scheme described above, defendants agreed to commit and

did commit mail fraud in violation of 18 U.S.C. §1341. Specifically, they used the mails to

further their scheme by, among other things: sending letters on January 10 and 11, 2001 to

Gagliardi instructing him not to release the escrowed funds to the Labels Companies and sending

a letter on January 18, 2001 to Zakian trying to cover up the true reason why the funds had not

been released as promised.

119.    In furtherance of the scheme described above, defendants agreed to commit and

did commit wire fraud in violation of 18 U.S.C. §1343. Specifically, they used the interstate

communications, including telephones, cellular telephones, emails and electronic wires, to: set

up the closing wherein they seized control of the Labels Companies' desperately needed funds;

transfer the funds from First & Ocean's accounts to an escrow account under Gagliardi's name;

and cover up the true reason why the funds had not been transferred to the Labels Companies.

120.    Through the conduct described above, defendants engaged in a continuous pattern

of racketeering activity to force the Labels Companies to buy back Dion's shares, against their

will, at an unconscionable price, and to cause plaintiffs to suffer other damages.

121.    As a direct and proximate result of defendants' conduct described in paragraphs 1

through 120 plaintiffs have suffered damages to their business and/or property.

## COUNT VII

### (Violation of 18 U.S.C. §1962(d)—RICO)

122.    Plaintiffs repeat, reallege, and incorporate their responses contained in paragraphs 1 through 121 above.

123.    Each defendant agreed to the commission of two or more of the predicate acts described above in paragraphs 112 through 121.

### REQUESTS FOR RELIEF

WHEREFORE, Labels, Inc. respectfully requests that the Court:

A.    Enter judgment in favor of plaintiffs and against defendants on Counts I, II, III, and V of the Complaint and award damages in an amount to be determined at trial;

B.    Under Count III, VI and VII, award plaintiffs multiple and/or treble damages, attorney's fees and costs;

C.    Under Count IV, declare the purported agreements null and void;

D.    Award such other relief as the Court deems just and proper.

**PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted,

LABELS, INC., FLEX-PRINT, INC.,
AND LABELS REALTY TRUST

By their attorneys,

William C. Nystrom (BBO #559662)
Dana A. Zakarian (BBO #641058)
NYSTROM BECKMAN & PARIS LLP
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100
(617) 778-9110 (fax)

Dated: August 13, 2004

℣JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Labels, Inc., Flex-Print, Inc. and Labels Realty Trust

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

William C. Nystrom, BBO#559656 and Dana A. Zakarian, BBO#641058
Nystrom Beckman & Paris LLP, 10 St. James Ave., 16th Floor, Boston,
MA 02116, (617) 778-9100

**DEFENDANTS**

Robert Dion, Banknorth Group, Inc., as Successor in Interest to
First & Ocean National Bank, Healey, Deshaies & Gagliardi,
and Phillips, Guerstein, Holber & Channen

County of Residence of First Listed _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

04-11770 JLT

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☑ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                    and One Box for Defendant)

| | PLF | DEF | | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☑ 470 Racketeer Influenced and |
| Judgment | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 151 Medicare Act | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| Student Loans | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| (Excl. Veterans) | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| ☐ 153 Recovery of Overpayment | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| of Veteran's Benefits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 160 Stockholders' Suits | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 790 Other Labor Litigation | or Defendant) | Determination Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | | State Statutes |
| | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☑ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

18 U.S.C. Section 1962

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ >$1,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE  8/13/04

SIGNATURE OF ATTORNEY OF RECORD  Dana ___

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) _Labels, Inc., et al. v. Robert Dion, et al._

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

[X] I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

[ ] II. 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.   for patent, trademark or copyright cases

[ ] III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
380, 385, 450, 891.

[ ] IV. 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
690, 810, 861-865, 870, 871, 875, 900.

[ ] V. 150, 152, 153.

04 - 11770 JLT

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_n/a_

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES [ ]   NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES [ ]   NO [X]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES [ ]   NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES [ ]   NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES [ ]   NO [X]

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division [ ]   Central Division [ ]   Western Division [ ]

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division [X]   Central Division [ ]   Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES [ ]   NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _William C. Nystrom, BBO#559656 and Dana A. Zakarian, BBO#641058_
ADDRESS _10 St. James Ave., 16th Floor, Boston, MA 02116_
TELEPHONE NO. _(617) 778-9100_

(Coversheetlocal.wpd - 10/17/02)